Thomas L. Holland,

*vs.*

National Automotive Fibres, Inc.

*New Castle, June* 25, 1938.

*Christopher L. Ward, Jr.,* of the firm of Marvel, Morford, Ward & Logan, for complainant.

*James H. Hughes, Jr.,* of the firm of Ward & Gray, for defendant.

THE CHANCELLOR: At the hearing, the defendant in addition to presenting the new contention which its amended answer advances, undertook to re-examine the reasoning on which the opinion heretofore filed was based. I see no cause for departing from the reasoning which controlled the former decision. See *ante p.* 99, 194 *A.* 124. Unless, therefore, the case as now made is different in substantial respects from the case as it was presented at the hearing on bill and answer, the conclusion now should be the same as then.

Has anything new been presented, then, which should lead the court to a different conclusion? The amended answer avers the necessity which the corporation was under to create a new stock which would be junior to the preferred and common stock authorized and outstanding prior to March 15, 1930, when an amendment to the certificate was adopted creating the class A common, dividends on which are the subject of the present controversy. That amendment created such junior stock. It was called class B common stock. The old seven per cent. cumulative pre-

ferred stock, which was convertible into old common on the basis of six shares of old common for one of preferred, was retained, and a new class A common carrying an annual two dollar cumulative dividend rate was created. The old common stock was automatically reclassified into class A common. The amendment changed the conversion right of the preferred so as to make it convertible on the same six for one basis into class A common instead of into plain common stock as theretofore. The dividend rights of class A common are defined in the amendment and may be seen by reference to the quotation from the amended certificate at page 103 of the report of the prior opinion found *ante p.* 99, 194 *A.* 125. The quotation will not be here repeated.

The amended answer avers that in order to secure the consent of the holders of the preferred stock to the amendment of the certificate of incorporation of March 15, 1930, it was necessary to secure to preferred stockholders, after the amendment, "reasonably attractive dividend rights, i. e., the same dividend rights, and to provide for a conversion privilege equal to that already enjoyed by the preferred stock and as nearly identical thereto as could be desired." Testimony tending to the same effect was adduced.

This may all be true. But I do not see just how it helps us much in interpreting the language of the amendment to the charter in respect of the question which is discussed in the former opinion.

The amendment to the answer proceeds to aver that before the amendment to the certificate of incorporation was adopted or even drafted, the executives of the company (who were also voting trustees for the common stock and individually owned or represented for corporate owners outstanding voting trust certificates representing more than two-thirds of the outstanding shares of the common

stock) approached certain preferred stockholders and representatives of preferred stockholders to the extent of at least two-thirds of all the outstanding preferred stock in order to ascertain what sort of amendment to the certificate of incorporation would be acceptable to the preferred stockholders, particularly to ascertain what conversion rights should be preserved to the existing preferred stock. As a result of the conference between these groups, the amended answer avers, the old preferred stockholders were assured that each share of their existing stock "would continue to have upon conversion the right to receive six shares of stock, which would be the exact equivalent (in every respect including the provision pertaining to cumulative dividends) of the re-classified stock upon the day of conversion." This averment is confusing, because prior to the reclassification of stock by the amendment, the preferred stock had no right upon conversion to receive shares of stock carrying a right to cumulative dividends. It was to receive six shares of ordinary common stock for each share of preferred. Under the reclassification it was to receive for each share six shares of another kind of stock— class A common calling for a fixed cumulative dividend. What then is the pertinency of the expression in the averment in the amended answer—"would continue to have * * * the exact equivalent * * *", quoted *supra?*

As a matter of fact the preferred stock, after the reclassification, was given the right to be converted into six shares of the stock into which the old common was reclassified, class A common, for each share converted, and such stock carried cumulative dividends. Thus far, therefore, the assurance given to the preferred stockholders and representatives of preferred stockholders present at the conference above referred to was fulfilled.

No challenge is made by the complainant against the general right of the class A common stock to cumulate the unpaid annual two dollar dividends. The only challenge

goes to the question of whether the cumulations on the class A common into which preferred was converted in 1935, shall reach back to January 1, 1930, a little over five years before the conversion was made, during which period the preferred was receiving its regular seven dollar per share dividend.

Now that question was neither raised nor discussed at the conference above mentioned. At all events the answer as amended does not say so. Neither does the evidence show it.

It is argued that the parties at the conference understood from the assurance there given (before quoted from the amended answer) that no matter when a conversion occurred the class A stock received in exchange would reach back to January 1, 1930, for the measure of its cumulative burden. I do not think the assurance as stated necessarily carries that meaning. At all events, when it was formulated in words and undertaken to be written into the charter by way of amendment, it was so phrased as not to convey the meaning which is now sought to be attributed to it. The former opinion is to that effect.

But, says the defendant, the opinion so construing the amendment dealt with language that is ambiguous, and where that is so, the court may resort to evidence *aliunde* the writing to discover the true intent of the parties. When the interpretation of a contract is involved, the court may undoubtedly resort to parol evidence to clarify ambiguity. Parol evidence in such cases may deal with custom, usage, the meaning of technical and trade terms, words that are latently ambiguous, surrounding facts and circumstances at the time the contract was made, and previous negotiations between the parties.

It is not, however, permissible for a party under the guise of offering parol evidence for the purpose of clarifying obscurity to call witnesses to testify as to the meaning

of the contract as written. Interpretation in the light of all the evidence is the function of the court, not of witnesses.

As I read the evidence in this case, it appears to me that the defendant has sought by witnesses to inform the court of what, in their opinion was intended and what, therefore, the interpretation of this so-called contract should be. The parol evidence rule does not go that far.

But is it proper to consider this case as falling within the category of ordinary cases calling for the interpretation of a written contract? This is a case that involves the interpretation of a corporate charter. A corporate charter in one of its aspects has often been referred to as a contract between the stockholders. That is true. Who were the parties that met in conference prior to the adoption of the amendment and assumed to agree upon the outline of its terms? Looking to the group of stockholders called "preferred" we find them represented by some who were present in person but mostly by a firm of bankers who had been instrumental in selling preferred stock. How investment bankers who had sold preferred stock to the public can, by reason of their having done so, be regarded as the continuing agents of their customers for the purpose of making agreements, it is impossible to see. There were then, only a few preferred stockholders present at the conference. But even conceding the authority of the bankers' representatives to represent the persons to whom they had previously sold preferred stock, it still remains that nearly a third of the preferred stockholders knew nothing of what was transpiring. As to the common stockholders they were purported to be represented to the extent of something over two-thirds of the outstanding shares by the voting trustees.

It is apparent then that not all the stockholders subscribed to the results of the conference before referred to. Conceding to the understanding reached at the conference

even more of definiteness than I have hereinbefore attempted to demonstrate it did not posses, it nevertheless remains that not all the parties to the so-called contract between the stockholders were present.

In view of the fact that it is rarely possible in advance of a corporate meeting to bring all the stockholders of a corporation into negotiations looking to the alteration of their *inter sese* contract, it is reasonable to say that, unless all are shown to participate in the negotiations, it is not pertinent to refer to what some did or said in negotiating on their own account as evidence in aid of what all meant when the final action was reduced to a written expression of the common intent and adopted in a formal meeting regularly convened.

It is reasonable in interpreting the intent of an amendment to a corporate charter, to restrict the resort to evidence *aliunde* the document as an interpretative aid more in accordance with the principles of statutory construction than in accordance with principles applicable to the construction of ordinary contracts. In the interpretation of statutes the language as written is invested with more of sanctity and is subject to less of extraneous aid in its interpretation, than is the language of the typical and ordinary contract between individuals.

In the instant case therefore, I am disposed to adhere more to the evidence of intent as the same is revealed by the words used in the amendment than to resort to the rather vague understandings which some of the stockholder parties entertained prior to the adoption of the amendment.

There was some evidence from the lips of the draftsman of the amendment as to what he intended it to mean. This evidence I regard as irrelevant. The case is not one where all the parties to the so-called contract were in agreement upon a common intent and made a mistake in the language employed to express it.

The conclusion from the foregoing is that the opinion heretofore expressed and reported *ante p.* 99, 194 *A.* 124, is reaffirmed.

Now as to the relief. The injunction prayed for seeks to restrain the payment of all dividends on the class A stock held by those preferred stockholders who converted their preferred stock into class A common in 1935, in so far as such dividends are applicable to arrearages that accumulated thereon prior to the date of issue to them. The answer avers and the evidence shows that it is impossible because of sales and transfers on the exchanges and the consequent splitting of certificates in connection therewith, to identify the individual holders of all of the class A common that was issued as a result of such conversion in 1935. If so, it is impossible as a practical matter to afford the relief prayed for to the fullest extent. It is not right that all dividends on account of class A common accumulations prior to 1935 should be enjoined in order to make certain that none would be paid to those who, according to the conclusion here reached, are not entitled to receive them. There are 217,086 shares of class A common outstanding which are clearly entitled to be paid the accumulations from January 1, 1930. These are the shares into which the old common was automatically reclassified by the amendment of March 15, 1930. The injunction should operate only to the extent that the shares against which it is directed are identifiable.

Decree accordingly.